**DANIEL SANSONI**
13248 Moss Park Ridge Drive
Orlando, FL 32832
(215) 333-7790
Plaintiff and Parent of Plaintiffs

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| Daniel SANSONI, by himself and on behalf of KM (a minor) and KDM (a minor), | |
| Plaintiffs, | Case No. |
| v. | |
| ORANGE COUNTY SCHOOL BOARD | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs, Daniel Sansoni, by himself, and on behalf of KM (a minor) and KDM (a minor), hereby file this complaint against Defendants, Orange County School Board (OCSB), alleging as follows:

**INTRODUCTION**

1. Plaintiffs, Daniel Sansoni, KM (a minor), and KDM (a minor) respectfully submit this complaint.

2. Plaintiff Daniel Sansoni is the father of both KM and KDM.

3. Plaintiffs are all long-time residents of Orange County, Florida.

4. The Defendant, Orange County School Board (OCSB), oversees the Orange County Public Schools (OCPS).

5. Plaintiffs, KM and KDM, attend Orange County Public Schools and have only attended Orange County Public Schools in all of their years of schooling.

6. Plaintiff, KM, is a disabled child.

7. Plaintiff, KM, is one of the rare students of OCPS who has an Individualized Education Plan (IEP). An IEP is a plan developed to ensure that a child with a disability who attends a public school receives specialized instruction and related services. This is a requirement by law and by US Supreme Court precedent.

8. Plaintiff, KM, is one of the extremely rare students of OCPS who has a signed contract with the OCSB. This contract came about because KM brought suit against OCSB in a prior proceeding. OCSB settled the matter and signed a contract with KM. Please see the contract attached hereto at Complaint Exhibit A.

9. OCSB has now breached this contract. OCSB has been given numerous opportunities by plaintiff to not breach the contract. Yet, they have still openly breached it. Therefore, a lawsuit is the only recourse to stop this breach.

10. At all times prior to this lawsuit, plaintiffs never asked for one penny from the OCSB. The plaintiffs only sought the proper education of KM and KDM. As part of the

contract, plaintiffs would release their various tort claims (penalties for crimes, defamation, vile conduct, etc) against the OCSB.  Other tort claims existed outside of the contents of the contract. However, now that the OCSB has breached the contract, plaintiffs bring forth all tort claims and seek significant damages against the OCSB.  In addition, plaintiffs will file a Motion seeking an Order to compel actions under the contract.  These damages are since OCSB has acted in bad faith, with malevolent intent, and infringed upon human rights.

## PARTIES

11.  Plaintiff, Daniel Sansoni, is a Florida citizen and the father of KM and KDM.  All plaintiffs have lived at the same address in Orange County during all events listed in this complaint and have never moved.

12.  Plaintiff, KM, is a 14 year old boy who attends Orange County Public Schools and has done so since the age of 3.

13.  Plaintiff, KDM, is an 11 year old boy who attends Orange County Public Schools and has done so since the age of 5.

14.  Defendant, Orange County School Board (OCSB), is the school board for the public schools of Orange County, Florida, and is tasked with overseeing and making the decisions for the Orange County Public Schools (OCPS).

## JURISDICTION AND VENUE

15.  This Court has jurisdiction over this action pursuant to The Individuals with Disabilities Education Act, 20 U.S.C. § 1400, which allows jurisdiction in this Court for a breach of a written agreement after the written agreement has been made.  "The parties shall execute a

legally binding agreement that is enforceable in any State Court of competent jurisdiction or in a district court of the United States."  20 U.S.C. § 1415(1)(B)(iii)(II).

16.  Venue is proper in this District since all events or omissions giving rise to the claims occurred in the Middle District of Florida.

17.  Sovereign Immunity (Florida Statute 768.28) does not apply in this matter since OCSB acted in bad faith, with malevolent intent, and infringed upon human rights.

## FACTUAL ALLEGATIONS

18.  KM has attended OCPS since the age of 3 years old.  Despite living at the same address, KM was transferred to various schools of OCPS.  KM started at Sun Blaze Elementary School.  He was transferred to Vista Lakes Elementary School, Hidden Oaks Elementary School, and Eagle Creek Elementary.  Plaintiffs never complained about these transfers despite the schools being far from his home and outside of the confines of the local school which was Moss Park Elementary School.

19.  Plaintiff KM never had any significant problems or issues at Sun Blaze Elementary School, Vista Lakes Elementary School, Hidden Oaks Elementary School, or Eagle Creek Elementary.  Minor issues occurred like KM running about the bus or KM running out of Vista Lakes Elementary School.

20.  KM was finally transferred to Moss Park Elementary School where significant problems developed.  In total, OCPS transferred KM to 5 separate public schools and the plaintiffs never complained about this.  (KM graduated Moss Park Elementary School and is now attending Innovation Middle School (School number 6)).

21. At all times material hereto, plaintiff, Daniel Sansoni, attended all of KM's Individualized Education Plan (IEP) meetings and never missed one.

22. While in the 3rd grade, in the 2018/2019 school year, the officials at Eagle Creek Elementary (plaintiff's attending school) explained that Moss Park Elementary (plaintiff's local school) will now have an Autism Spectrum Disorder (ASD) unit. Prior to this, Moss Park Elementary did not have an ASD unit. The Eagle Creek School officials asked plaintiffs whether they would like to stay at Eagle Creek or be transferred to Moss Park Elementary School. Eagle Creek Elementary School scheduled a meeting in the Spring of 2019 with the principal of Moss Park Elementary School. This principal was Dr. Stephanie Osmond.

23. In this meeting in May of 2019, Principal Osmond conducted this meeting with numerous families. Principal Osmond explained that the ASD unit at Moss Park Elementary School will be very good and have a low student to teacher ratio. It is important for ASD children to have a low student to teacher ratio in order for them to be able to achieve their academic goals. Based on these assurances by Principal Osmond, the plaintiffs decided to transfer KM and KLM to Moss Park Elementary for the 2019/2020 school year. KM would be in the 4th grade and KLM would be in the 2nd grade.

24. In the Fall of 2019, KM started the 4th grade at Moss Park Elementary in the ASD unit and KLM started the 2nd grade at Moss Park Elementary.

**Incident against KDM**

25. In the Fall of 2019, Plaintiff Daniel Sansoni noticed that the teacher to student ratio in the ASD unit for KM was very high (which was in contrast to the promise of Principal Osmond). Sometime in September, 2019, of the new school year, Daniel Sansoni was dropping off the children and saw Principal Osmond on the grounds and mentioned the high ratio to her.

Daniel Sansoni asked her about her assurances from the Spring of 2019 during the transition meeting where she stated the ratio would be small.  Principal Osmond stated it was within the law.  It is unknown the exact date of this conversation.

26.  A week or two later, on September 26, 2019, KLM (the brother of KM) was sitting with other students in gym class.  KLM's class had two teachers.  Furthermore, there was a PE instructor for a total of three instructors.  The children were all sitting out in the open.  The guidance counselor, Lisa Miller, was walking by and claims she saw KLM inappropriately touching another student.  There was no reasonable reason for the guidance counselor to be there as three teachers were monitoring the class and a guidance counselor should be in the confines of the school and not at a PE class.  Based on this observation by the guidance counselor, the guidance counselor filed an OCPS Managerial Directive A-4 complaint against KLM stating he was a child abuser.  This was a false report.

27.  On September 27, 2019, the Vice Principal and the School Resource Office (from the Orange County Sheriff's Office) met with KLM.  They decided that the report was unfounded.  The Vice Principal spoke with plaintiff Daniel Sansoni and said the record would be shredded at the end of the day.  This was not true.

28.  On September 30, 2019, the plaintiff, Daniel Sansoni, went to the school and met with Principal Osmond, the Guidance Counselor Lisa Miller, and the School Resource Officer.  The School Resource Officer seemed reasonable and seemed like he conducted his investigation professionally.  He was required to investigate any report received.

29.  On the other hand, Principal Osmond and Guidance Counselor Lisa Miller seemed aloof and nervous.  Principal Osmond directed Lisa Miller to not answer any questions.  Lisa Miller complied.  Lisa Miller was under the full control of Principal Osmond.

30.  For some odd reason, during this meeting, Principal Osmond grabbed the mother of KDM.  The mother filed a complaint about this improper touching.  This complaint went no where.

31.  The A-4 complaint against KLM was a false report.  It is alleged that this was an attack against plaintiffs since Plaintiff, Daniel Sansoni, questioned Principal Osmond about the class ratio of KM a week or two before.  It is alleged that this was the false reporting of a sexually based crime against a disabled family who questioned Principal Osmond about something related to the ASD unit.

32.  The police report against KDM is a permanent record that never gets destroyed. KDM was only 7 years old and was forced to undergo a vicious accusation and be forced to meet with officials and the police solely as an attack against the plaintiffs because the parent questioned Principal Osmond about the high student to teacher ratio.

33.  On May 11, 2021, two child welfare officers and four police officers showed up at the house of another family of an autistic child.  The children of the family attended Moss Park Elementary School.  The six professionals were investigating the parent for sexually abusing his child.  The claim was unfounded.  A week prior to this incident, the parent had emailed Principal Osmond about a pandemic mask question.  It is alleged that this was an attack against this family since the parent questioned Principal Osmond about a mask issue.  It is alleged that this was the false reporting of a sexually based crime against a disabled family who questioned Principal Osmond about something related to the ASD unit.

34.  It is believed that similar incidences have happened at Moss Park Elementary School under the guise of Principal Osmond.

35.  No other incidences were ever reported or suspected against KLM before or after this incident.

36.  Plaintiffs allege that a pattern and practice of attacking parents of disabled children and the children themselves occur at Moss Park Elementary School under the tenure of Principal Osmond.

37.  The OCSB has done nothing to curb this and its investigations were haphazard and nonexistent.  The legal team at OCSB has full control over the investigations of wrongdoing of the staff at OCSB.  There is no independence of any investigators at OCSB and the investigators are merely a sham instituted to show the appearance of something real.

**Incident against Plaintiff Daniel Sansoni**

38.  As stated above, Daniel Sansoni has attended all of KM's IEP meetings.  In addition, he has gone to all of the open houses, volunteered for events, contributed to the schools, attended class trips, etc.  Daniel Sansoni has cleared background checks as required by OCSB's Additions Program.  Daniel Sansoni was even recognized for community service by OCPS' teachers in the Spring of 2023 and invited to a luncheon for his service.

39.  OCPS teachers are fantastic people with good hearts.  However, OCPS is also made up of a large administration with motives.

40.  An IEP meeting for KM occurred on February 2, 2021.  Plaintiff brought up the student to teacher ratio and how high it was.  Plaintiff asked for it to be lowered.  The staffing specialist decided to continue the meeting.

41.  A new IEP meeting occurred on March 22, 2021.  Principal Osmond asked OCPS attorney Sarah Koren to attend.

42. During this March 22, 2021, IEP meeting, Ms. Koren took over the duties of the Staffing Specialist. This should be a very standard meeting. It should be informal. It is very rare for attorneys to appear.

43. Ms. Koren's role was to advise her client (OCPS) and its employees. Her role was not to run the meeting. This is exactly what she tried to do. She presented a written agenda and stated that this was how the meeting was going to go or else she would shut down the meeting. She did not provide a copy of the written agenda. She threatened to shut down the meeting around five or six times and ultimately did shut down the meeting. She did not allow parental questions or presentation of documents and did not allow the parents to be heard so that the IEP would only exist as how OCPS saw fit.

44. Per quotes of Sarah Koren in a video presentation:

32:30 - "Because, frankly in our district it wasn't always that way. Our district's perspective for a long time was to fight almost everything that came through."
44:00 - "Sometimes schools can be nasty too. Don't get me wrong."
54:52 - "Their final party for their staff might go away." "They don't lose their fun money." "We do not settle for anything that we are not ready, willing, and able to do."
58:10: "They have a right to bang on a table once or twice. They have a right to be upset. They have a right to raise their voice."
59:00 "If we have an employee who violates the code of civility, we ask them to leave." "It is a really nifty document when we need it."

45. Ms. Koren stated the following two things to the plaintiff Daniel Sansoni during the meeting:

"If you speak, it is the unauthorized practice of law."
"You are not the parent."

46. Under no circumstance was Plaintiff ever practicing Florida law. Plaintiff never claimed to be an attorney during the meeting. Plaintiff never claimed to be a Florida licensed attorney during the meeting or at any time in his entire life. Plaintiff was there to be an advocate

for his son, KM.  Yet, Ms. Koren threatened plaintiff with a crime of the unauthorized practice of law.

47.  Ms. Koren said during the meeting that plaintiff was doing the unauthorized practice of law.  This was a pure threat intended to diminish plaintiff's ability to talk and help his son, KM.  The meeting was conducted and held under duress.

48.  Assuming plaintiff was not KM's parent, plaintiff still would have been able to be present and speak and not be threatened with a crime of unauthorized practice of law.  Section 1002.20 of the Florida Statutes states:

(21)PARENTAL INPUT AND MEETINGS.—

(a)*Meetings with school district personnel.*—Parents of public school students may be accompanied by another adult of their choice at a meeting with school district personnel. School district personnel may not object to the attendance of such adult or discourage or attempt to discourage, through an action, statement, or other means, the parents of students with disabilities from inviting another person of their choice to attend a meeting. Such prohibited actions include, but are not limited to, attempted or actual coercion or harassment of parents or students or retaliation or threats of consequences to parents or students.

49.  Under 4-3.4 (g) and (h) of the Rules Regulating the Florida Bar, an attorney must not threaten criminal charges or disciplinary charges to obtain advantage in a civil matter.

50.  It is alleged that Ms. Koren violated these rules.  She threatened plaintiff with both a crime and disciplinary charges.  She did so to silence plaintiff.  She did so to hurt KM.  She did so with anger in her voice and tone which further shows a lack of compassion and remorse.  Again, the meeting was conducted and held under duress.

51.  Ms. Koren exclaimed loudly in a sign of frustration to all present (around 10 people) regarding plaintiff "You are not the parent."  This was slander.  Everyone knew plaintiff was the

parent.  KM's mother was sitting right there and said plaintiff was the parent.  Countless

documents showed that plaintiff was the parent.

### Incident Against KM

52.  After the March 22, 2021, meeting, Principal Osmond and Ms. Koren became even

more difficult.

53.  On April 9, 2021, in the process of going home from school via the buss, KM was

left alone in a classroom with only a helper and no teacher and no other students.  KM came

home crying which lasted for over an hour.  This was a first.  KM is mostly nonverbal and can

not explain what happened.

54.  KDM was asked what happened since he rode the bus home with KM.  KDM

explained he saw KM with a male teacher who said "he needs to learn."  The bus driver was a

witness to KM's extended crying.

55.  There were bruises on KM's back.

56.  This incident was referred to Principal Osmond.  The investigation by Principal

Osmond was shoddy at best.  This shoddy investigation was done intentionally.  As previously

explained, Plaintiff continuously tried to get a lower student to teacher ratio.  Principal Osmond

would not allow this.  Therefore, since there was only a few teachers (a teacher and a helper) for

a large class of ASD children (approximately 16 ASD students to one teacher), a potential abuse

situation occurred.

### 2nd Incident Against Daniel Sansoni

57.  On May 25, 2021, Plaintiff Daniel Sansoni had a telephone call with Ms. Koren.

Attorney Amy Envall of OCPS was listening in on the phone call.  The phone call was possibly

recorded.  Plaintiff Daniel Sansoni had no idea that Ms. Envall was listening in on the call.

58. The intent of the listening in (and possible recording) was to try to somehow entrap Plaintiff Daniel Sansoni.

59. In an email from Ms. Envall on June 4, 2021, Ms. Envall writes:

"With respect to your assertion regarding Ms. Koren's demeanor in your last call, I personally sat in on that call and I can, and will, attest that she was incredibly civil and professional throughout."

60. In an email from Ms. Envall on June 9, 2021, Ms. Envall writes:

"Only Ms. Koren and I were in the room during the call and the door was closed – I was sitting in a chair and she was sitting at her desk.  The phone call was not recorded.  As I am sure you are aware, it is illegal to record a conversation in the State of Florida without everyone's consent."

61. It is alleged that OCPS, by and through its employees, committed a crime against Plaintiff Daniel Sansoni.  It is not only illegal to record a conversation without consent, but it is also illegal to intercept a call without consent.  934.03, Florida Statutes.

62. Regardless of Ms. Envall's admissions, it is still believed the call was recorded.

63. Only 2 weeks after the admission of Ms. Envall, the due process case (further described below) settled.

**Settlement with OCSB**

64. On May 12, 2021, after Ms. Koren's outburst and unprofessionalism, and after the potential abuse situation, plaintiff filed a due process complaint against OCSB for their various unprofessional actions.  The complaint alleged OCSB doing a late IEP meeting, conducting unfair meetings, delay tactics, criminal threats, not being able to talk during meetings, not giving KM drinks all day long, conducting an IEP meeting with no notification, and the school allowing a paraprofessional to solely teach the class which led to a possible violent assault against KM.

65. The case was filed before the State of Florida Division of Administrative Hearings. On June 23, 2021, the plaintiff and OCSB came to an agreement to settle and jointly signed a

contract.  Plaintiff notified the State of Florida Division of Administrative Hearings on June 24, 2021, and the matter was dismissed.

66.  As part of the June 23, 2021, contract with OCSB, OCSB was required to do certain things during the 2021/2022 school year.  Other requirements did not have an end date.  This was an important part of the settlement because plaintiff wanted certain items to exist well past the 2021/2022 school year.  Plaintiff agreed to not proceed with various tort actions in order to ensure that OCSB would give KM much needed learning avenues such as occupational therapy and speech therapy.  Therefore, the contract does not have an end date for occupational therapy and speech therapy.  In addition, the contract does not have an end date for ensuring that OCPS opened the juice boxes for KM during lunch.

67.  After the settlement, there was no significant problems between plaintiffs and OCPS or OCSB for the next few years.  Only one issue arose.  Plaintiff Sansoni sought KM to be held back for a second year of 5th grade based on various issues.  Principal Osmond refused this.  State law allowed this and Principal Osmond was not successful.

68.  The subsequent IEP meetings for the next two years went very smoothly.  It was always common practice in the past for OCPS to try to deny occupational therapy to KM.  In the IEP meetings during the 2021/2022 school year and the 2022/2023 school year, the occupational therapist team (who was not privy to the contract) again tried to claim occupational therapy should be eliminated.  They do this because their model is try and eliminate services as a cost savings tool.  Plaintiff Daniel Sansoni pointed to the contract in both sets of meetings.  The staffing specialist conferred with OCSB's legal team in both years and the legal team agreed that the contract controlled in both years.

69. A new IEP meeting occurred on December 19, 2023 for the 2024/2025 school year. The occupational therapist team (who was not privy to the contract) again tried to claim occupational therapy should be eliminated. Again, they do this because their model is try and eliminate services as a cost savings tool. Plaintiff Daniel Sansoni again pointed to the contract. The staffing specialist asked for a continuance of the meeting so she could confer with the school district for guidance.

70. The school district of OCPS conferred with its legal team of OCPS. This process took a month. On January 19, 2023, via an email, the school district (for the first time) now believes the contract was for only the 2021/2022 school year. The school district is incorrect. In doing so, the school district tries to use meeting notes from June 17, 2021, IEP meeting instead of the contract itself which was dated six days after the June 17, 2021, IEP meeting. Section 415(f)(2)(F)(i) of IDEA states that all discussions during the medication process are confidential and they are precluded from being used as any evidence. OCSB is wrong under IDEA and under the contract and are doing this to harass the plaintiffs and deny FAPE.

71. On February 2, 2024, the continuation IEP meeting of the December 19, 2023, meeting occurred. This was an illegal meeting as it was only to discuss the amount of occupational therapy which was already settled by contract. During this meeting, the plaintiff explained the meeting was improper and that it should not go forward. Plaintiff explained that the parole evidence rule and case law was in his favor. Plaintiff explained that the contract was unambiguous. Plaintiff explained that the IEP meetings from 2021/2022 and 2022/2023 would support that the contract continued indefinitely for the remainder of KM's time at OCPS. OCPS conducted the meeting anyway and took away KM's occupational therapy.

72.   It should be noted that, per the contract, plaintiff was only seeking 10 hours of occupational therapy for the entire school year.  This is not per week or per month but 10 hours for the entire year.  The meeting lasted 2 hours and the district had 9 employees present for a total of 18 staff hours for one IEP meeting about giving 10 hours of therapy for an entire year. The decision was predetermined and OCPS took away these 10 hours during this IEP meeting.  It should be noted that OCPS changed its position four times regarding Occupational Therapy during this month long period.  OCPS went from giving 10 hours per year of OT, to saying (via email) that they would use data, to saying (after being questioned) that they would consider parental input, and then to canceling OT altogether.  This is not professionalism or concern for the child.  This is power by the administration and retaliation.  Of course, it was also a breach of an unambiguous contract.

73.   During the illegal meeting on February 2, 2024, OCPS staff would not let plaintiff ask the occupational therapist questions.  This was illegal.  If this suit was not being brought forth, plaintiff would have a new due process case against the OCSB for this issue alone.  Per the director of the ESE department via an email, "Per OCPS policy, school personnel respond to communications within 48 hours."

74.   The contract is unambiguous, valid, and complete.  The contract sets forth what is to be done in certain years because it contains specific dates for certain items.  For other items, there is no end date.  This is exactly for what plaintiff Daniel Sansoni negotiated.

75.   The meeting notes from the 2021/2022 school year do not pass the parole evidence rules of the State of Florida.  Ample parole evidence law in Florida case law shows that contemporaneous or prior statements are not allowed to construe a contract.  Furthermore, the records of OCPS in their notes have a history of repeated errors.  Furthermore, the meeting notes

from the 2021/2022 school year do not have an end date on occupational therapy either. Furthermore, IDEA prevents discussions during a resolution meeting to be allowed as evidence.

76. Rather, the contract is unambiguous and does not need interpretation.  The contract explains items which have an end date and items which do not have an end date.  If parole evidence is needed to construe the contract, ample parole evidence law in Florida case law shows that subsequent actions would be admissible to construe the contract.  This evidence would be the referrals to the District of OCPS in the two IEP meetings during the 2021/2022 school year and the 2022/2023 where OCPS agreed that the contract allowed for the continuation of occupational therapy for the duration of the contract.

77. During the 2021/2022 school year IEP meeting, the IEP notes by OCPS state "The parent mentioned that he would like occupational therapy to continue.  He did not provide consent for the evaluation to take place based on the settlement agreement."  Although not noted in the notes, the district program specialist was present and left the meeting to confer with the ESE director who agreed that the contract controlled.

78. During the 2022/2023 school year IEP meeting, the IEP notes by OCPS state "The team will follow up with the parent once Ms. Moore (district program specialist) is able to get clarification from Ms. Lee-Wenze (ESE director) as to what agreement was made with parent as to what OT should look like based on resolution meeting held on 6/2021."  After the clarification, occupational therapy continued per the contract.

79. OCPS (and hence the OCSB) is simply wrong and, now, are trying to undo a legitimate and unambiguous contract.

80. OCPS has now breached the contract.  Therefore, all tort actions which were released in the contract should now be able to move forward.  Furthermore, any limitations should be

tolled and case law supports this.  This Court should issue an Order requiring OCSB to fulfill the items in the contract with no end date.

**Additional Tort Actions**

81.  Principal Osmond was calculated in her plans.  She knew she could rest on the A-4 Complaint as there exists protections in the law for mandatory reporting.  These arguments should fail due to the unreasonableness of the attack and her actions against similarly situated families.

82.  In addition, Principal Osmond used numerous other tools in her arsenal.  Principal Osmond repeatedly and consistently and purposely referred to Plaintiff Daniel Sansoni by misstating his name.  It would be Santoni or Sansori or Santini or any other number of combinations.  This happened ten times or more through her phone calls and when meeting her in person.

83.  In addition, Principal Osmond would not send the weekly newsletter to Plaintiff Daniel Sansoni.  On the times that she did send the weekly newsletter to Plaintiff Daniel Sansoni, she would do so in Spanish.  This occurred ten times or more.

84.  In addition, Principal Osmond barred Plaintiff Daniel Sansoni from attending the field trip for his child.

85.  In addition, Principal Osmond commented to Daniel Sansoni that she watched his youtube videos that he posted about his trips with his children.

86.  Attorney Sarah Koren unmasked plaintiff KM (a minor) in an administrative proceeding by repeatedly using his full name.

87.  Attorney Sarah Koren, for some odd reason, tried to falsely refer to plaintiff Daniel Sansoni as a sexist in an administrative proceeding because he typed the word "female."  She did

this to try to gain an edge.  This was libel.  Attorney Sarah Koren has a history of doing such things and referred to another parent as a racist when they were not in order to gain an edge.

88.  OCPS refused to help KM open his juice during his school day so the child would be reduced to having no drinks all day long.  At the time, KM was unable to open his juice.  The legal team of OCPS maintained the position and directed this to its staff that no OCPS personnel could open the juice of KM.  This is an abuse of simple human rights.

89.  As part of the June 23, 2021, Contract, OCPS was to provide KM with a 1:1 paraprofessional for the entire 2021-2022 school year.  Principal Osmond hired the paraprofessional.  KM is mostly nonverbal.  When one is trying to teach a child how to talk, it would be important for him to have a paraprofessional who could speak with him so that he could understand her.  Principal Osmond hired a paraprofessional with a very high speech impediment.  It was nearly impossible to hear her English.  Plaintiff Daniel Sansoni never complained about this because the paraprofessional was extremely nice and kind and Plaintiff felt that all people have the right to work.  Nonetheless, this was intentional and retaliation by Principal Osmond as a means to further hurt KM and his family.

90.  During the week of January 29, 2024, plaintiff was notified that the calming room for all the children in KM's class was taken away when school resumed on January 9, 2024.  Many children with ASD experience sensory overload and oftentimes need a safe place to calm down.  The children had this room for the past year and a half.  The December 19, 2023, IEP meeting was only a few days prior to this date when the calming room was taken away.  It is believed this action was retaliatory since plaintiff brought up his concerns about the contract during the December 19, 2023, meeting

## CAUSES OF ACTION

## COUNT ONE

## BREACH OF CONTRACT

91.  The allegations contained in paragraphs 1 through 90 above are repeated and incorporated as though fully set forth herein.

92.  As described above, defendants (OCSB) have breached the June 23, 2021, contract. Plaintiffs have honored all terms of the contract.  Plaintiffs have done nothing to force defendants to breach the contract.  Quite the opposite, plaintiffs have given numerous warnings to OCPS to not breach the contract.

93.  Defendants have breached the contract in bad faith.  OCSB refuses to honor the contract despite notification of this lawsuit.

94.  Solely as a result of this breach by OCSB, plaintiffs have been forced to undergo a multitude of additional expenses and has been caused to suffer because of defendant's breach.

95.  As a direct and proximate result of defendant, OCSB, breach of duty as aforesaid, plaintiffs have incurred, and/or may hereafter incur, other expenses or losses, including that of lost education to KM and denial of Free Appropriate Public Education (FAPE) to KM.

96.  WHEREFORE, plaintiffs, seek an Order from this Court enforcing terms, seek an Order requiring a new and fair IEP meeting without involvement from OCPS District Representatives and legal counsel, and appropriate damages for breach of contract, plus attorney's fees (if hired) and court costs.

## COUNT TWO

## FILING A FALSE REPORT/FALSE IMPRISONMENT

97. The allegations contained in paragraphs 1 through 96 above are repeated and incorporated as though fully set forth herein.

98. As described above, the A-4 Complaint and subsequent police report against KDM was a false report.

99. Defendant, OCSB, by and through the aforesaid actions of its staff, acted to confine and/or restrain plaintiff, KDM, to a bounded area within the aforementioned school, all with the intent of causing havoc to the plaintiff and plaintiff's family.

100. Defendant, OCSB, by and through the aforesaid actions of its staff, intended to confine and/or restrain plaintiff, KDM, to a bounded area within the school, all with intent of causing havoc to the plaintiff and plaintiff's family.

101. Defendant, OCSB, by and through the aforesaid actions of its staff, resulted in plaintiff, KDM, being confined and/or restrained to a bounded area within the aforementioned school.

102. The aforementioned confinement and/or restrain of plaintiff, KDM, was neither supported by probable cause nor any claim of privilege. Furthermore, the initial A-4 complaint was done so without reasonableness and was done purposely to attack a family who requested a benefit for an ASD classroom.

103. As a direct and proximate result, plaintiffs, Daniel Sansoni, KM, and KDM, have suffered harm to their reputation, emotional stress, mental anguish and humiliation, and they may continue to suffer same for an indefinite time in the future, for which plaintiffs hereby make a claim.

WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demands judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

**COUNT THREE**

**TORTIOUS INTERFERENCE/CRIMINAL THREAT**

104.  The allegations contained in paragraphs 1 through 103 above are repeated and incorporated as though fully set forth herein.

105.  As described above, defendant, OCSB, by and through its attorney, Sarah Koren, would not let plaintiff speak during an IEP meeting.  She stated "If you speak, it is the unauthorized practice of law."

106.  The unauthorized practice of law is a crime in the State of Florida.  Under 4-3.4 (g) and (h) of the Rules Regulating the Florida Bar, an attorney must not threaten criminal charges or disciplinary charges to obtain advantage in a civil matter.

107.  The act of silencing plaintiff Daniel Sansoni was a criminal threat to silence someone or else the meeting would end and FAPE would be denied.

108.  The act of silencing plaintiff Daniel Sansoni is an act of tortious interference so the meeting could not be done properly or else the meeting would end and FAPE would be denied.

109.  All of the above actions of defendant OCSB were designed to conduct an IEP meeting with no input from parents and to deny FAPE to a disabled child.

110.  WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demands judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

**COUNT FOUR**

**DEFAMATION**

111.  The allegations contained in paragraphs 1 through 110 above are repeated and incorporated as though fully set forth herein.

112.  As described above, defendant, OCSB, by and through its attorney, Sarah Koren, slandered plaintiff Daniel Sansoni during the IEP meeting in front of approximately 10 people. She stated "You are not the parent."  This was a lie and she knew it was a lie.  She exclaimed this with frustration and anger and did so before a large group of people.  Furthermore, Sarah Koren stated in front of all "If you speak, it is the unauthorized practice of law."

113.  This was done with the intent to silence plaintiff Daniel Sansoni so he could not advocate for his son, KM.  The actions of Ms. Koren were to intentionally deny FAPE to a disabled child.

114.  As described above, defendant, OCSB, by and through its employee, Principal Osmond defamed plaintiff Daniel Sansoni by repeatedly misspelling, misstating, and mispronouncing his name with the intent of belittling him.

115.  The above actions by OCSB was defamatory in that it tended to harm the reputation of plaintiff, Daniel Sansoni, so as to lower him in the estimation of the community and/or deter third persons from associating and/or dealing with him.

116.  Defendant, OCSB, by and through the aforesaid statement of its employees, was published to persons other than to plaintiff, Daniel Sansoni, to whom it was directed.

117.  Defendant, OCSB, by and through the aforesaid statements of its employees, was published intentionally and knowingly.

118.  In the alternative, defendant, OCSB, by and through the aforesaid statements of its employees was published with reckless disregard of its truth or falsity.

119.  In the alternative, defendant, OCSB, by and through the aforesaid statements of its employees was published negligently, to wit, where a reasonable person under the circumstances would not publish and/or make such a statement.

120.    Defendant, OCSB, by and through the aforesaid statements of its employees, was directed specifically to plaintiff, Daniel Sansoni.

121.    At all times material hereto, plaintiff, Daniel Sansoni, understood said statement to be one imputing a criminal offense to him.

122.    At all times material hereto, those bystanders near plaintiff, Daniel Sansoni, and to whom said statements were published, understood said defamatory statements to impute a criminal offense directed to plaintiff.

123.    As a direct and proximate result, plaintiff, Daniel Sansoni, has suffered harm to his reputation, emotional stress, mental anguish and humiliation, and he may continue to suffer same for an indefinite time in the future, for which plaintiff hereby makes a claim.

124.    All the above constitute the tort of defamation (libel and slander) and the defendant, OCSB, should be found responsible for this.

125.    WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demands judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT FIVE

## WIRETAPPING/INTERCEPTING A CALL

126.    The allegations contained in paragraphs 1 through 125 above are repeated and incorporated as though fully set forth herein.

127.    As described above, defendant, OCSB, by and through its attorneys, Sarah Koren, and Amy Envall wiretapped and/or intercepted plaintiff, Daniel Sansoni's, phone call.  This was all done with the intent to deny FAPE to a disabled child.

128.    The actions of OCSB, by and through its employees, amount to that of a crime.

129.  Statutory damages are allowed as a civil penalty under Florida Statute 934.23 which amounts to preliminary, equitable, and declaratory relief in addition to a civil penalty of not less than $1,000.00.

130.  Defendant, OCSB, in its emails, have already admitted to this crime and/or violation of the statute.  Furthermore, the intent of the crime and/or violation of the statute was to deny FAPE to an innocent disabled child.

131.  WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demand judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT SIX

## ASSAULT AND BATTERY

132.  The allegations contained in paragraphs 1 through 131 above are repeated and incorporated as though fully set forth herein.

133.  As described above, defendant, OCSB, by and through its staff, allowed KM (a disabled child) to be left alone in an empty classroom with only a helper and not a teacher.

134.  If there was a lower ratio, no abuse situation would have occurred.

135.  Principal Osmond allowed this harmful and offensive situation to develop by not hiring appropriate support staff.  Rather, she kept a guidance counselor who was not needed at the elementary level.

136.  As a direct and proximate result, KM experienced damages in the form of a potential harmful or offensive contact.

137.  KM had a bruise on his back.  He cried for over an hour after coming home from the bus.

138.  Principal Osmond did a shoddy investigation.

139. KM may have been assaulted and battered by the helper. Unfortunately, KM can not explain what happened. Discovery may help to uncover what happened.

140. Therefore, based on the above, it is alleged that KM was assaulted and battered by the employees of OCSB. Furthermore, it is alleged that Principal Osmond caused a hostile work environment and threatened teachers and staff which may have escalated negative actions against KM.

141. Plaintiff KM experienced pain and injury as well as mental and emotional trauma that is permanent in nature.

142. WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demand judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT SEVEN

## CHILD ENDANGERMENT

143. The allegations contained in paragraphs 1 through 142 above are repeated and incorporated as though fully set forth herein.

144. As described above, defendant, OCSB, by and through its staff, directed its staff to not open plaintiff's KM's juice boxes, a child who at the time did not have the manual dexterity to do so himself. This was a deprivation of basic human dignity and were actions made by the legal team of OCPS. More so, they would have let him suffer all day in the Florida heat rather than help him out.

145. The intent of these actions were to create a denial of FAPE to KM and to cause him to suffer all because his parent asked for a lower student to teacher ratio.

146. WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demand judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

**COUNT EIGHT**

**DENIAL OF FREE APPROPRIATE PUBLIC EDUCATION (FAPE)**

147. The allegations contained in paragraphs 1 through 146 above are repeated and incorporated as though fully set forth herein.

148. All of the allegations above were designed specifically by OCSB to deny FAPE to KM.

149. OCSB has consistently violated the law, breached a contract, and have done so in violation of IDEA and US Supreme Court case law. The US Supreme Court has upheld the necessity of FAPE and IDEA. OCSB, by and through its staff, have violated these laws with malicious intent and actions unbecoming of a school system.

150. Plaintiffs seek all statutory penalties as allowed under the law of IDEA and US Supreme Court precedent.

151. WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demand judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

**COUNT NINE**

**RETALIATION**

152. The allegations contained in paragraphs 1 through 150 above are repeated and incorporated as though fully set forth herein.

153. As described above, OCPS had given a calming room to the ASD children for the past year and a half. Plaintiff Daniel Sansoni brought up his claim that the contract should be honored in an IEP meeting on December 19, 2023. A few days later, when school resumed, the calming room for all ASD children was taken away.

154.  OCPS Management and its legal team have engaged in a carrot and stick approach to forcing principals to act as they see fit.  As described above, OCPS Attorney Sarah Koren explains this by stating that the district will take away their "fun money" or not let them have their end of the year party.

155.  Similarly, Principal Osmond was forced to undergo similar actions since she refused or could not hire appropriate ASD staff.  Her natural reaction was to create a false attack against an innocent 7 year old by creating an illegal criminal report.

156.  Numerous law protect against retaliatory conduct in the context of education and disabilities.  Some are 34 CFR 100.7(e), 34 CFR 106.71, 34 CFR 104.61, and 28 CFR 35.134.

157.  Plaintiffs seek all statutory penalties as allowed under these laws.

158.  WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demand judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

## COUNT TEN

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

159.  The allegations contained in paragraphs 1 through 158 above are repeated and incorporated as though fully set forth herein.

160.  Defendant, OCSB's actions, by and through the aforesaid actions of its employees, amount to extreme and outrageous conduct, going beyond all possible bounds of decency and should be regarded as atrocious and utterly intolerable in a civilized community.

161.   Defendant, OCSB, by and through the aforesaid actions of its employees, intended to cause plaintiffs to suffer sever emotional distress.

162.   In the alternative, defendant, OCSB, by and through the aforesaid actions of its employees, acted in reckless disregard as to the effect said actions would have on plaintiffs.

163.    As a direct and proximate result, plaintiffs have suffered severe emotional distress, mental anguish and humiliation, including, but not limited to, fright, horror, grief, shame, embarrassment, anger, and chagrin, and they may continue to suffer same for an indefinite time in the future, for which plaintiff hereby makes a claim.

WHEREFORE, plaintiffs, Daniel Sansoni, KM, and KDM, each demand judgment against the defendants, OCSB, in a sum in excess of Fifty Thousand Dollars ($50,000.00).

Dated: 02/14/2024                      Respectfully Submitted,

                                       /s/ Daniel Sansoni_____
                                       Daniel Sansoni, Plaintiff for himself and
                                       plaintiffs, KM and KDM

Complaint Exhibit A

## DUE PROCESS RESOLUTION AGREEMENT
## DIVISION OF ADMINISTRATIVE HEARINGS CASE NUMBER #21-1577E

This Agreement constitutes a legally binding contract between the Petitioner ("Student") and the Respondent Orange County School Board ("District"), as a full and complete resolution of all matters raised in Case No. 21-1577E, pending before the Florida Division of Administrative Hearings. The parties hereby agree as follows:

1.      Parent agrees to provide the written consent required under State Board of Education regulations to permit Access Points instruction and Alternate Assessment of the Student, for the entire 2021-2022 school year. A consent form has been provided contemporaneously with this agreement that will be executed by the parent and returned to the District along with this executed settlement agreement.

2.      District agrees to provide a 1:1 paraprofessional to the Student for the entire 2021-2022 school year.

3.      District agrees to provide the Student with ninety (90) minutes of language therapy per week.

4.      District agrees to provide the Student with sixty (60) minutes of occupational therapy per month, to be delivered in two thirty (30) minute segments. District will also conduct an occupational therapy reevaluation of the Student, upon provision of parent's written consent.

5.      District agrees to indicate in IEP team notes dated June 17, 2021, that staff will assist the Student with opening his juice box during breaks or at lunch in order to consume liquids.

6.      Petitioner's parent, on behalf of the minor Petitioner, agrees to dismiss with prejudice the pending Due Process Complaint and further forever releases The School District of Orange County, Florida, including all its agents, employees, attorneys, board members, and representatives for any causes of action or claims that arose, or have arisen, prior to the date on which Petitioner has signed this agreement. This release prevents Petitioner from prosecuting any administrative complaints, Florida State Board of Education complaints, Office for Civil Rights complaints, suits, debts, dues, damages, including compensatory and punitive damages, sums of money, claims and demands of whatsoever kind or nature, in law or in equity, which Petitioner ever had, now has, or may acquire against Respondent arising out of the facts and allegations asserted in this Due Process Complaint. This Release shall not waive or release the School District of Orange County, Florida from any causes of action or claims that may arise after the date on which Petitioner has signed this agreement. This Release shall also apply to any and all costs and attorneys' fees arising out of this Due Process Complaint.

Agreed to on this the 18th day of June 2021.

PARENT DANIEL SANSONI, ON BEHALF OF                    6/18/21
                                                       DATE

1

_[signature]_        6/23/2021

ORANGE COUNTY SCHOOL BOARD AUTHORIZED REPRESENTATIVE     DATE
TAJUANA LEE-WENZE

2